IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KRISTIN C. HAINES, et al.,          :          CIVIL NO.: 1:15-cv-00513
      Plaintiffs,          :
                  :
        v.          :          (Judge Kane)
                  :          (Magistrate Judge Saporito)
M.D. REKHA A. CHERIAN,          :
et al.,          :
      Defendants.          :

**FILED**
**WILKES BARRE**

FEB 2 9 2016

Per _____ M S _____

## MEMORANDUM

    This is a medical negligence action which comes before the court on a motion to compel discovery (Doc. 23) filed by the plaintiffs.[1]

### I.   Factual Background

    The plaintiffs initiated this action on March 13, 2015, by the filing of a complaint. (Doc. 1). The plaintiffs alleged that the defendants misread a CT scan that misdiagnosed the mother-plaintiff, pregnant with twins, with a pulmonary embolus when she only had a case of the flu while hospitalized at Penn State Milton S. Hershey Medical Center ("Hershey"). As a result of the alleged misdiagnosis, the plaintiffs contend that mother-plaintiff was improperly treated with lovenox, a blood thinner,

---

[1] This matter was assigned to the undersigned U.S. Magistrate Judge on December 1, 2015 for the purpose of resolving this discovery dispute. (Doc. 26).

which caused massive internal hemorrhaging and severe brain damage to the gestating twin fetuses. (Doc. 1, ¶1).

During the paper-discovery portion of the case, a dispute arose over the defendants' responses and objections to plaintiffs' document requests dated April 24, 2015 (the "April requests"), and June 24, 2015 (the "June requests"). The motion papers indicate that counsel for the parties have met and conferred on the disputed requests but have not been able to reach an agreement. The plaintiffs' motion and their briefs are somewhat ambiguous in defining the specific requests that remain unanswered.

During oral argument, we determined that an *in camera* review of the records at issue was required. Our order dated January 19, 2016, granting *in camera* review followed. (Doc. 35). On the same date, we ordered plaintiffs' counsel to provide the court with a more particular list of the outstanding discovery requests that are subject to the motion to compel. (Doc. 36). Thereafter, we received a letter dated January 21, 2016, from plaintiffs' counsel clarifying the disputed items. (Doc. 38).

In the letter, plaintiffs' counsel advised that the documents subject to our *in camera* review relate to the April requests. At oral argument,

2

plaintiffs' counsel categorized those requests as follows: (1) incident reports; (2) investigative notes, memoranda, and correspondence; and (3) adverse-event letters. We received the subject documents on January 26, 2016 from defense counsel. Upon review of the *in camera* documents, we categorize them as follows:

1. Document identified as QF1 - QF97;

2. Bates Nos. 3151 - 3155;

3. Bates Nos. 3156 - 3160; and

4. Bates Nos. 3161 - 3165.

With respect to the June requests, in his letter, plaintiffs' counsel informed us that the only outstanding requests are Request Nos. 7, 8, and 20. (Doc. 38, at 1). Plaintiffs maintain that Requests 7 and 8 relate to the publications of Dr. Lahiji who was one of the residents who viewed the CT scan at issue. Id. Request 20 relates to a PowerPoint presentation of a journal review of incidental pulmonary emboli. The request seeks production of the withheld portions of the PowerPoint which were prepared by defendant Dr. Cherian. Id.

3

The defendants assert that the April requests and Request 20 of the June requests encompass documents protected from discovery by the Pennsylvania Peer Review Protection Act ("PRPA"), 63 P.S. §425.1 et seq., and the Pennsylvania Medical Care Availability and Reduction of Error ("MCARE") Act, 40 P.S. §1303.101 et seq.[2]   The plaintiffs have withdrawn their requests for cell phone records of the individual defendants. (Doc. 29, n.1).

The issues have been briefed and oral argument was held before the court on January 19, 2016. The matter is now ripe for decision.

II.   Legal Standards

The proper scope of discovery is set forth in Rule 26 of the Federal Rules of Civil Procedure, which provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties'

---

[2] In their discovery objections, the defendants also asserted that this requested discovery was protected by attorney-client privilege and the work-product doctrine. But, in their brief, they failed to address these objections and thus we deem them abandoned for purpose of this motion (Doc. 27) and these documents.

resources, the importance of the discovery in resolving
the issues, and whether the burden or expense of the
proposed discovery outweighs its likely benefit.
Information within this scope of discovery need not be
admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).[3]

_____

[3] By order dated April 29, 2015, the Supreme Court of the United
States adopted certain amendments to the Federal Rules of Civil
Procedure, which took effect on December 1, 2015. Order ¶¶ 1–2 (U.S.
Apr. 29, 2015) (amending Fed. R. Civ. P. 1, 4, 16, 26, 30, 31, 33, 34, 37,
55, and 84), available at http:// www. supremecourt. gov/ orders/
courtorders/ frcv15 (update) _1823. pdf (Apr. 29, 2015). These
amendments included a modification to Rule 26(b), moving language
regarding the proportionality of discovery from (b)(2) to (b)(1), restoring
proportionality as an express component of the scope of discoverable
information and omitting certain language deemed extraneous by the
advisory committee. See Fed. R. Civ. P. 26(b) advisory committee's note
(2015 amendment); see also Steven S. Gensler, Moore's Federal
Practice: The 2015 Amendments to the Federal Rules of Civil Procedure
§§ 1.14P–1.16P (2015). Notably, the Supreme Court's Order of April 29,
2015, provides "[t]hat the foregoing amendments . . . shall take effect
on December 1, 2015, and shall govern all proceedings in civil cases
thereafter commenced and, insofar as just and practicable, all
proceedings then pending." Order ¶ 2 (U.S. Apr. 29, 2015); see also 28
U.S.C. § 2074(a); Fed. R. Civ. P. 86(a)(2) (amended rules govern
pending proceedings unless applying them "would be infeasible or work
an injustice").

   This action was commenced in March 2015, before adoption of
amended Rule 26(b)(1), and discovery was commenced no later than July
2015, before the effective date of the amended rule. As a result, the
amended Rule 26(b)(1) applies to this case only "insofar as just and
practicable." Neither party has suggested that application of the amended
rule to this case would not be just and practicable, and the proportionality
(continued...)

As this Court has previously stated:

> Rule 26 establishes a liberal discovery policy. Discovery is generally permitted of any items that are relevant or may lead to the discovery of relevant information. Moreover, discovery need not be confined to items of admissible evidence but may encompass that which appears reasonably calculated to lead to the discovery of admissible evidence.

Clemens v. N.Y. Cent. Mut. Fire Ins. Co., 300 F.R.D. 225, 226 (M.D. Pa. 2014) (citations omitted).

When the Court is presented with a motion to compel discovery,

> [t]he burden is on the objecting party to demonstrate in specific terms why a discovery request is improper. The party objecting to discovery must show that the requested materials do not fall within the broad scope of relevance or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.

Id. at 227 (citations, internal quotation marks, and alteration omitted).

Finally, any assessment of a discovery dispute must consider the substantive legal issues that give shape to the boundaries of relevance in

--------

[3](...continued)
of discovery is not material to the issues raised by the pending discovery motion. Based on the foregoing, the Court finds that application of the amended rule in this case is both just and practicable.

a particular case, both at trial and in discovery. The complaint in this

action asserts medical negligence claims against the defendants.

> To prevail in a medical malpractice action in
> Pennsylvania, a plaintiff must establish the elements
> for negligence, namely 1) a duty owed by the
> physician to the patient, 2) a breach of that duty by
> the physician, 3) that the breach was the proximate
> cause of the harm suffered, and 4) the damages
> suffered were a direct result of the harm. Quinby v.
> Plumsteadville Family Practice, Inc., 907 A.2d 1061,
> 1070-71 (Pa. 2006). Stated differently, "[t]he
> fundamental issue in medical malpractice cases . . . is
> whether the defendant violated the applicable
> standard of care and, if so, whether that violation
> resulted in injury to the plaintiff." Pringle v.
> Rapaport, 980 A.2d 159, 173 (Pa. Super. Ct. 2009).
> Expert testimony is generally required in a medical
> malpractice action to establish the proper standard of
> care, the defendant's failure to exercise that standard
> of care, and the causal relationship between the
> failure to exercise the standard of care and the
> plaintiff's injury. Freed v. Geisinger Med. Ctr., 971
> A.2d 1202, 1206 (Pa. 2009).

Smith v. United States, Civil Action No. 3:09-CV-249, 2012 WL 3017704

at *7 (W.D. Pa. July 23, 2012).

III.     Discussion

A.     Hershey's Performance Improvement Plan

Counsel for the defendants has directed us to Hershey's

Performance Improvement Plan (the "Plan") regarding the confidentiality

7

of the documents. (Doc. 27-2). The Plan's purpose is set out as follows:

> The purpose of the organization's PI Plan and accompanying programs is to demonstrate a systematic process for prioritizing and improving important organizational and patient care functions. The process is patient driven and focuses on identifying opportunities for system improvements.

(Id. at 3).

Our review of the Plan reveals that it lacks a particular protocol for the investigation and reporting of incidents or serious events. (Doc. 27-2). However, the Plan does contain each group's purpose and from whom it receives reports and to whom it sends reports, as well as its membership and the frequency with which it meets. Also, the policy was effective March 2014, the month of the incident which forms the basis of the plaintiffs' complaint.

The defendants submitted an affidavit of Megan Adams, R.N. (Doc. 27-1), a registered nurse employed as a Patient Safety and Quality Analyst at Hershey. (Id. ¶2).   She was a member of the Quality Care Review Committee ("QCRC"). The Plan states the purpose of the QCRC as follows:

> • Reviews and designates sentinel events, serious events, incidents, and infrastructure failures.
>
> • Reviews, evaluates and makes recommendations for

> actions on quality of care issues identified through case reviews.
>
> • Identifies and communicates to the CQO system issues and trends identified as opportunities for improvement.

(Doc. 27-2, at 9). In addition, the QCRC receives reports from the risk management patient safety officer and event reporting and sends reports to the Patient Safety Committee. Id. The Plan requires that upon identification of an error, sentinel/serious event or incident, the employee will:

> • Perform necessary healthcare interventions to protect and support the patient's condition and to contain the risk to others.
>
> • Contact the patient's physician to report the error.
>
> • Preserve any information or physical evidence related to the error.
>
> • Report the error to the immediate supervisor.
>
> • Document the facts in the medical record and complete an occurrence report.
>
> • Submit the event report to Risk Management.
>
> • If the event meets the definition of a serious event the Patient Safety Officer, and Risk Management are notified immediately.
>
> • During off shift hours, the House Manager will be notified and follow the established chain of command for

> notification of the Administrator on call (AOC), as
> indicated.
>
> • The AOC will notify the Patient Safety Officer, or
> designee, notifies the CMO, and others as indicated. An
> investigation of the event is performed to determine
> confirmation of a sentinel event, serious event or incident.

<u>Id.</u> at 16. Finally, the Plan provides the following regarding

confidentiality:

> <u>Confidentiality and Compliance</u>
>
> The confidentiality protections afforded in Act 13
> apply <u>solely</u> to documents, materials or information
> prepared or created pursuant to the responsibilities of
> the patient safety committee or governing board of the
> medical facility.
>
> Any documents, material or information prepared or
> created for the purposes of complying with the patient
> safety plan, reporting, notification and investigation,
> which are reviewed by the Patient Safety Committee,
> Infection Control Act 52 Sub Committee or BOD of the
> medical facility, are confidential and will not be
> discoverable or admissible as evidence in any civil or
> administrative action or proceeding.
>
> Persons responsible for or participating in meetings
> of the Patient Safety Committee, Infection Control Act
> 52 Sub Committee or BOD will not be required to
> testify as to any matters within the knowledge gained
> by the person's responsibilities or participation on the
> Patient Safety Committee, Infection Control Act 52
> Sub Committee or BOD of the medical facility.

<u>Id.</u> at 17.

In her affidavit, Nurse Adams states that QFI-QF97 reflects information she obtained solely for purposes of consideration by the QCRC as part of its evaluation responsibilities to determine whether the event met reporting criteria under the MCARE Act. (Doc. 27-1 ¶ 9). With respect to documents identified as Bates Nos. 3156-3160 and 3161-3165, Nurse Adams states that they were reports made by a Hershey staff member pursuant to hospital policy and the MCARE Act. (Id. ¶¶ 6-7). The document Bates-labeled Nos. 3156-3160 was assessed by her to determine whether the event met reporting criteria under the MCARE Act. (Id. ¶ 6). Adams stated that the document Bates- labeled 3161-3165 was the subject of her inquiry into the patient's treatment at Hershey and presentation to a subgroup meeting of the QCRC for review, discussion, assessment, and determination whether the event met reporting criteria under the MCARE Act. (Id. ¶ 9). Her affidavit does not address the document Bates-labeled Nos. 3151-3155.

B. MCARE

Hershey maintains that the documents subject to our *in camera* review are immune from discovery under Section 311 of the MCARE Act which states, in pertinent part, that:

11

> Any document, materials or information solely
> prepared or created for the purpose of
> compliance with section 310(b) or of reporting
> under section 304(a)(5) or (b), 306(a)(2) or (3),
> 307(b)(3), 308(a), 309(4), 310(b)(5) or 313 which
> arise out of matters reviewed by the patient
> safety committee pursuant to section 310(b) or
> the governing board of a medical facility
> pursuant to section 310 (b) are confidential and
> shall not be discoverable or admissible as
> evidence in any civil or administrative action or
> proceeding.

40 P.S. §1303.311(a). In addition Section 311(a) contains an "original

source" exception which states that any documents, materials or records

"that would otherwise be available from original sources shall not be

construed as immune from discovery . . . merely because they were

presented to the patient safety committee or governing board of a medical

facility." Id. Also, the MCARE Act limits the confidentiality protections

"to the documents, materials or information prepared or created pursuant

to the responsibilities of the patient safety committee or governing board

of a medical facility." 40 P.S. §1303.311(c).

As a Pennsylvania trial court recently observed:

> Under the plain language of section 311(a),
> documents are protected from discovery only if: (1)
> they were "solely prepared or created for the
> purpose of compliance with" the MCARE Act's

> "serious events" reporting requirements or the
> patient safety committee's responsibilities under
> section 310(b); (2) they "arise out of matters
> reviewed by the patient safety committee . . . Or
> the governing board" pursuant to section 310(b);
> and (3) they are not otherwise available "from
> original sources." As a consequence, if the
> investigation of an incident by the defendant
> hospital was not "commenced at the request of or
> by the defendant's Patient Safety Committee," the
> confidentiality protections afforded by Section
> 311(a) are inapplicable. Similarly, absent proof
> "that the [Quality Assurance Review] forms were
> reviewed by a patient safety committee or by the
> hospital's governing board," the confidentiality
> provisions of section 311(a) have no application.

Venosh v. Henzes, No. 11 CV 3058, 2013 WL 9593953 *10 (Lackawanna

County C.C.P. July 17, 2013). (citations omitted)

C.   PRPA

Similarly, the defense asserts that the documents are protected

from discovery by PRPA which provides in relevant part as follows:

> The proceedings and records of a review committee
> shall be held in confidence and shall not be subject to
> discovery or introduction into evidence in any civil
> action against a professional health care provider
> arising out of the matters which are the subject of
> evaluation and review by such committee and no
> person who was in attendance at a meeting of such
> committee shall be permitted or required to testify in
> any such civil action as to any evidence or other
> matters produced or presented during the proceedings
> of such committee or as to any findings,

13

recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, That information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee . . . .

63 P.S. §425.4.

Under the statute, a "review organization" is "any committee engaging in peer review." 63 P.S. §425.2. The term "peer review" is defined as "the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other health care providers, including practice analysis, inpatient hospital and extended care facility utilization review . . . and the compliance of a hospital . . . with the standards set by an association of health care providers and with applicable laws, rules and regulations." Id.

The Pennsylvania legislature enacted PRPA to facilitate self-policing in the health care industry. Dodson v. DeLeo, 872 A.2d 1237 (Pa. Super. Ct. 2005). We are further guided by the Dodson court's explanation that:

The PRPA represents a determination by the legislature that, because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its

14

> own activities. The PRPA is meant to facilitate comprehensive, honest, and potentially critical evaluations of medical professionals by their peers.

Id. at 1242 (citations and internal quotation marks omitted).

In addition, requests for documents under the PRPA must be clearly defined and narrowly tailored. Id. Non-peer review business records are not protected even if those records eventually are used by a peer review committee. Id.

### D. *In Camera* Review—The April Requests

We have reviewed, *in camera*, the four sets of documents submitted to us. With respect to the document labeled QFI-QF97, we note that only QFI through QF14 contain confidential emails and/or information which were subject to the QCRC's responsibilities. However, QF-15 through QF-97 are documents that were not solely prepared for the purpose of MCARE Act or PRPA compliance. Moreover, those documents would otherwise be available from original sources. In fact, the mother-plaintiff executed an authorization that her entire medical record be released to Maternal Fetal Medicine at Lancaster General Health.[4]

---

[4] In their brief, the defendants acknowledged that of the 111 pages withheld, 82 pages are selections from mother-plaintiff's medical

(continued...)

15

Therefore, we find that only QF1 through QF14 are protected from discovery by the MCARE Act as those documents were part of the review by the QCRC. QF-15 through QF-97 were not solely prepared for MCARE Act or PRPA compliance and  therefore, they are subject to discovery by the plaintiffs.

The three remaining sets of documents consist of five pages each and are entitled "Risk Management Worksheet Confidential Information." They relate to separate events. The document Bates-labeled Nos. 3151-3155 relates to a pharmacy issue that appears unrelated to the instant litigation. The report is designated as an "incident" and was reported to "PSRS." We presume that "PSRS" is the abbreviation for Patient Safety Review Supervisor.  In their brief, the defendants assert that they would obtain an affidavit relating to this document similar to Nurse Adams' affidavit with respect to the remaining documents.  No such submission has been filed with the Court. Nevertheless, *in camera* review of that document does not reveal any relevance to the issues of this litigation, and it was sent to the PSRS on April 30, 2014. Thus, we will preclude its

---

[4](...continued)
record and therefore she already possesses them. (Doc. 27, at 5).

disclosure.

The document Bates-labeled Nos. 3156-3160 indicates that it was sent to the PSRS on April 12, 2014, and it is classified as an incident. Therefore, we will preclude its disclosure.

The document Bates-labeled Nos. 3161 - 3165 indicates that it was not sent to the PSRS and that the event data was entered by Nurse Adams listing her receipt of the event on April 3, 2014. However, her email to the QCRC members was dated April 3, 2014, and contained the same information set forth in this document. In fact, this document consists of the same pages and information set forth in pages marked QF10 through QF14. Therefore, we will preclude the disclosure of the document Bates-labeled Nos. 3161-3165.

E. The June Requests

There are three particular requests at issue concerning the June set of requests. (Doc. 38).  Request No. 7 seeks production of documents made, received, and/or reviewed by anyone at the defendants' institutions related to the publication:

> Kligerman SJ, Lahiji K, Jeudy J, White CS, Detection of pulmonary embolism on CT; improvement using a model based iterative

> reconstruction algorithm compared to filtered back projection and iterative reconstruction algorithms. American Journal of Roentgenology (Submitted for review).

The defendants objected on the basis that the request is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. As drafted, this request is overly broad in that it essentially requires the answering parties to canvass everyone at Hershey and its institutions. The request may have some relevance if it were limited to specific individuals who may be deposed in the case and who may have had some participation in the care of the mother-plaintiff. In addition, it does not limit the time-period of the review of the document. Therefore, we sustain the defendants' objection to Request No. 7.

Request No. 8 seeks production of documents made, received, and/or reviewed by anyone at the defendants' institutions related to the publication:

> Lahiji K, Kligerman SJ, Jeudy J, White CS, Improved accuracy of pulmonary embolus-computer aided detection using iterative reconstruction compared to filter back protection. American Journal of Roentgenology (In press for October, 2014).

18

The defendants made the same objection. We agree that as drafted the request is overly broad. It may be pertinent if it were limited to specific individuals who may be deposed in the case and who may have participated in the care of the mother-plaintiff. Also, it is unclear whether the article was available at or before the date the cause of action accrued. Therefore, we sustain the defendants' objection to Request No. 8.

Request No. 20 requests the production of all documents made, received, and/or reviewed by Rekha Cherian, M.D., related to her involvement in the March 27, 2014, CT scan at issue in this lawsuit. The defendants objected on the basis that the documents are protected from discovery on the basis of PRPA and the MCARE Act as well as attorney-client privilege and the work-product doctrine. Other than the documents which we determined are precluded from discovery, we find that Request 20 is reasonable and relevant as Dr. Cherian, a defendant in this action, is listed as having reviewed and signed the subject CT scan. Moreover, the defense did not meet their burden of showing that either the attorney-client privilege or the work-product doctrine precludes discovery. Not knowing all of the documents reviewed by Dr. Cherian except for those

disclosed in response to Request 6 contained in the April requests, we cannot say, at this time, that either the MCARE Act or the PRPA precludes discovery. Therefore, the defendants' objections to Request 20 are overruled.

An appropriate order follows.

JOSEPH F. SAPORITO, JR.
U.S. Magistrate Judge

Dated: February 29, 2016